**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | | |
|---|---|---|
| MARQUISE ROBBINS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.:  7:15-CV-00124 (WLS) |
| | : | |
| WILLIAM ROBERTSON, *et al.*, | : | |
| | : | |
| Defendants. | : | |

<u>**ORDER**</u>

Before the Court is a Motion for Partial Summary Judgment filed by Defendants William Robertson and Marty Allen on August 16, 2021. (Doc. 78.) Plaintiff Marquise Robbins timely responded, and Defendants timely replied. (Docs. 83 & 90.) Accordingly, the motion for summary judgment is ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

I.  **PROCEDURAL HISTORY**

Plaintiff Marquise Robbins, a practicing Muslim, brought this action *pro se* as a prisoner on July 2, 2015, alleging that Defendants' failure to provide him properly prepared and nutritionally adequate vegan meals violated his rights under the Eighth Amendment, the First Amendment, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (Doc. 1.) In July 2016, Judge Langstaff issued a Report and Recommendation which, among other things, recommended granting the Defendants' motions to dismiss (Docs. 13 & 17) based on "Plaintiff's failure to set forth sufficient allegations of constitutional or federal law violations." (Doc. 26 at 9.) Plaintiff objected, and this Court overruled Plaintiff's Objection and adopted Judge Langstaff's Recommendation and dismissed this case. (Doc. 29.)

Thereafter, Plaintiff filed a Notice of Appeal (Doc. 31), and the Eleventh Circuit Court of Appeals found that the appeal was not frivolous and allowed it to proceed. (Doc. 38.) On July 23, 2019, the Circuit Court issued an unpublished opinion affirming the denial of Plaintiff's second motion to amend, affirming the dismissal of Plaintiff's RLUIPA damages

claim, instructing this Court to dismiss Plaintiff's request for an injunction as moot, and reversing and remanding the dismissal of Plaintiff's First Amendment and Eighth Amendment claims. (Doc. 41.)

While the case was on appeal, Plaintiff obtained legal counsel who continue to represent him in this action.[1] After the Circuit Court issued its mandate, this Court entered a Discovery Order and Protective Order and allowed Plaintiff to file a Third Amended Complaint seeking damages under RLUIPA based on a Supreme Court decision issued on December 10, 2020 that allowed a plaintiff to pursue damages against federal officers under the Religious Freedom Restoration Act (the "RFRA"), *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020). (Docs. 62, 64, 73.)

Thereafter, the Defendants, William Robertson and Warden Marty Allen, filed the pending Motion for Partial Summary Judgment, seeking summary judgment on Plaintiff's Eighth Amendment and RLUIPA damages claim, which has been fully briefed by the Parties. (Docs. 78, 83, 90.) The Court also granted Plaintiff's unopposed motion for oral argument on the motion for partial summary judgment (Doc. 87), and a hearing was held on December 21, 2021. (*See* Doc. 95.)

## II.    SUMMARY JUDGMENT STANDARD

### A.    Federal Rule of Civil Procedure 56

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Chow v. Chak Yam Chau*, 555 F. App'x 842, 846 (11th Cir. 2014) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013)). " 'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.' " *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which

---

[1] Plaintiff has also represented that he is no longer incarcerated. (Doc. 83 at 31.)

might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts.' " *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the non-movant must point to record evidence that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587-88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### A.   *Local Rule 56*

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. Here, Defendants properly filed a summary judgment motion with a statement of undisputed material facts, as required by the Federal Rules of Civil Procedure and the Local Rules of this Court. (*See* Docs. 78 & 78-1.) Plaintiff then filed a response to Defendants' statement of material facts and his own counterstatement of material facts as to which a genuine factual issue exists. (Docs. 83-1 & 83-2.) Defendants responded to Plaintiff's counterstatement of material facts. (Doc. 91.) Thus, both Parties have complied with the local rule's requirement on statements of fact. Having established the applicable standards, the Court will proceed to the facts.

### III.   RELEVANT FACTUAL BACKGROUND

The following facts are derived from the Complaints (Docs. 1, 49, 74); Defendants' Answers thereto (Docs. 52, 75); Defendants' Statement of Undisputed Material Facts (Doc. 78-1); Plaintiffs' response and statement thereto (Docs. 83-1 & 83-2); Defendants' response to Plaintiff's counterstatement of material facts (Doc. 91); and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to Plaintiff as the nonmoving party. *See* Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 587-88.

Plaintiff was an inmate at Valdosta State Prison ("VSP") from December 23, 2014 until September 2016. (Doc. 74 ¶ 8.) During this time, Defendant Robertson was a Food Services Director for VSP and for most of this time Defendant Allen was the Warden of VSP, and both Defendants were employed by the State of Georgia and the Georgia Department of Corrections ("GDOC"). *Id.* ¶¶ 9-10; Doc. 83-1 ¶¶ 2-3.

4

Plaintiff was a practicing Muslim before and during his time at VSP. (Doc. 91 ¶ 1.) As a Muslim, Plaintiff follows a "halal diet" which requires abstention from eating any animal products or by-products without knowledge of how the animal was slaughtered or any foods that have come in contact with "animal products or by-products or any unclean or impure substances," known as "haram." (Doc. 74 ¶ 14.) Through its "Alternative Entrée Program" ("AEP"), GDOC offers a vegan diet which, if properly prepared and served, should comply with the Islamic dietary laws. *Id.* ¶ 15. Plaintiff opted into the AEP immediately upon arriving at VSP, which was the only way to maintain a diet consistent with his religious beliefs. *Id.* ¶ 18. "Georgia Correctional Industries (GCI), a state agency, contracts with GDC to provide the food, supplies, menus, recipes, and instructions needed to prepare and serve meals at all [GDOC] facilities, including vegan and restricted vegan meals for inmates on the AEP." (Doc. 83-1 ¶ 5.)

Plaintiff alleges that in contradiction with GDOC's policies, the vegan meals he received "were underportioned, often not actually vegan, nutritionally inadequate, unsanitary, and contaminated with non-vegan foods, chemicals, and even dirt and insects." (Doc. 74 ¶ 19.) He alleges that the meals caused him "to lose weight and experience other adverse health effects, including headaches, dizziness, constant fatigue, and mental anguish." *Id.*

Specifically, Plaintiff alleges that his meals were served on poorly cleaned trays used for non-vegan meals, which contaminated his vegan meals. (Doc. 74 ¶ 24); (*see also* Doc. 83-2 ¶ 6) (Plaintiff testifying that there were remnants of chicken and rice in some of the corners of the compartments on the tray). He alleges that use of the non-vegan food trays also caused him not to receive full portions of his vegan food based on the size of the compartments on the non-vegan food tray. (Doc. 74 ¶ 24.) At his deposition, Plaintiff testified that he was given less than 2,000 calories a day and that one point he was only fed "excessive amount[s] of collard greens and nothing else." (Doc. 83-2 ¶ 8.) He also alleges that most of the time, the vegan meals were "adjacent to the non-vegan meals 'unprotected from immediate contact,'" contaminating his vegan food with non-vegan food and that while the trays were supposed to be labeled with names and cell numbers, they were not labeled, and he was frequently handed unmarked trays containing non-vegan meals. (Doc. 74 ¶ 24.) Furthermore, Plaintiff believes

that some of the vegan meals contained animal byproducts like "beef base" or gelatin made from pork ingredients. (Doc. 83-2 ¶ 9-10.) Each time he was given non-vegan food, Plaintiff was forced to either eat the food he was given or skip the meal—"the only food available." (Doc. 74 ¶ 25.) While Plaintiff usually skipped the meal, when he was unable to withstand the hunger, he would eat the non-vegan food and violate his religious beliefs. *Id.* ¶ 26.

Plaintiff also alleges that the meal service was unsanitary and that "(1) the food slots from which he received his food were rusted, contaminating his meals with a rusty residue; (2) the beverage pitchers contained cleaning chemicals; (3) the trays were not sufficiently cleaned; and (4) the ice cooler contained bugs, dirt, and food remnants." (Doc. 74 ¶ 27; Doc. 83-2 ¶ 24.) Specifically, Plaintiff observed staff serve drinks from the same pitcher containers that held chemicals to clean the showers earlier in the day, and the drinks served from those pitchers tasted like chemicals and dishwashing liquid. (Doc. 83-2 ¶¶ 24-26, 126-27.) Plaintiff contends that the only other water sources were the "putrid" tap water in his cell and the dirty ice cooler. *Id.* ¶¶ 28-29. He also testified that there were vermin, insects, bugs, and flies over his food and that the lack of sanitation exacerbated his hunger. *Id.* ¶¶ 20, 31.

He alleges that he repeatedly filed grievances and complaints and informed Robertson and Warden Allen of the issues with the vegan meals. (Doc. 74 ¶ 21.) In February 2015, Plaintiff submitted a grievance complaining about the inadequate quality of the vegan meals, their impact on his religion, and that he was "suffering from constant headaches, hunger pains, dizziness, constant fatigue, and lack of concentration as a result of the nutritionally and quantitatively inadequate vegan meals." *See* Doc. 83-9 at 10. The matter was investigated within VSP, addressed by Robertson, and denied by Warden Allen, followed by an appeal by Plaintiff which was also denied. (Doc. 83-9.) Plaintiff testified that he wrote letters to Robertson weekly and personally spoke to Warden Allen about the issues, even showing him his tray, and that other Muslim inmates also complained about the meals. (Doc. 83-2 ¶¶ 62-81.) But aside from a few weeks during which things improved shortly after he filed his grievance, the issues went largely unresolved.

Defendants dispute their subjective awareness of most of the problems alleged by Plaintiff in this case and the alleged extent of those problems. *See* Doc. 91. Indeed, the Parties

agree that "GCI employs, and at all times relevant employed, a registered dietician who creates uniform menus, referred to as 'Master Menus,' for use at all [GDOC] facilities. This means that all of [GDOC's] facilities are to be serving the same meals for breakfasts, lunches, dinners and snacks." (Doc. 83-4 ¶ 6.) While Robertson states that the vegan menus are free from animal products, Plaintiff points out that many of the menu items contain beef base or chicken base. (Doc. 83-1 ¶ 8.) Robertson states that in an average 28-day cycle, the vegan meals provide 2,700 calories daily. *Id.* ¶ 10. Robertson states that food staff were regularly trained about vegan meal preparation and service, and advisors regularly visited GDOC facilities regarding maintaining proper inventories and properly preparing and serving food. *Id.* ¶¶ 12-13. Further, while Defendants agree that there were roaches in the VSP kitchen sometimes, they contend that the kitchen was sprayed monthly and there is no evidence "that any roach had contact with Plaintiff's food." (Doc. 91 ¶ 30.) Robertson also states that color-coded trays were used to readily distinguish the vegan and non-vegan food trays, that vegan meals were prepared in a separate kitchen with separate utensils, and that inmates assigned to work in the vegan kitchen did not also work in the non-vegan kitchen. (Doc. 83-1 ¶¶ 16-21.) The Food Service Director and Assistant Director also regularly held classes for inmate workers to train them on proper food preparation, sanitation, and separating and avoiding cross-contamination of vegan food items and utensils. *Id.* ¶ 24.

Furthermore, Plaintiff was housed in protective custody in a lockdown unit the entire time he was at VSP. (Doc. 83-1 ¶ 1.) Plaintiff rarely left his cell and never went to the cafeteria or the kitchen. (Doc. 83-4 at 35-39.) His meals were delivered to his cell not by Robertson or his staff, but by VSP corrections officers. (Doc. 83-1 ¶ 26; Doc. 83-4 at 39-40.) At mealtimes, officers would open the flap on his door, and Plaintiff could see the food on the food carts. (Doc. 83-4 at 97-98.) Initially, Plaintiff observed that the vegan and non-vegan trays were unwrapped and adjacent on the same "unsanitized" cart, but after Plaintiff filed a grievance, he observed that they put the vegan trays on the bottom shelf "completely separate from the trays that's [sic] on that top shelf." *Id.* Plaintiff lived on the top range in his unit, and there was only one food cart for his range. *Id.* at 98. Plaintiff was also able to see inside the ice cooler on the cart "a few times," and the ice always had insects, dirt, or food crumbs. *Id.* at 129-31.

Notwithstanding Plaintiff's observations through the door flap, Robertson states that vegan meals were delivered to the lockdown buildings on a separate cart from regular meals. (Doc. 83-1 ¶ 28.) Defendants contend that upon arrival at the lockdown buildings, the Food Service Supervisor checked and recorded the temperature of the food to ensure it was proper. *Id.* ¶ 29. Defendants assert that the VSP corrections officers were given a list of the names and cell numbers of the inmates who were to receive vegan or other specially prepared meals. *Id.* ¶ 31. Defendants assert that "[n]either Mr. Robertson nor members of his kitchen staff were able to observe the handling and distribution of meal trays and beverages to inmates in the lockdown buildings, which was carried out by corrections officers." (Doc. 83-1 ¶ 66.) Further, Nurse Seleska who regularly saw and physically examined Plaintiff, never found him to be undernourished or declining in health, and she believes his BMI was always normal based on his height and that his weight fluctuations were not medically significant. (Doc. 78-6 ¶¶ 27-28.) In fact, a large portion of Plaintiff's medical visits at VSP were not related to weight loss, dizziness, or malnutrition but were because Plaintiff had a fungal rash or other dermatological condition. *See, e.g.*, Doc. 78-6 ¶¶ 6, 17, 18, 22, 23, 24, 25.

But Plaintiff asserts that he experienced "a multitude of symptoms, including: 1) throbbing headaches, 2) constant fatigue from lack of energy, 3) abdominal pains produced from constant hunger pangs, 4) dizziness in the late night hours that prevented sleep, 5) lack of concentration that prevented his ability to focus on simple daily routines, and 6) frequent weakness in his extremities." (Doc. 83-2 ¶ 42.) Plaintiff's blood test indicated elevated protein levels, and Nurse Seleska prescribed Plaintiff multivitamins and a "3x7" meal plan, which provided Plaintiff additional (albeit not initially vegan) meals. *Id.* ¶¶ 46-49. Repeatedly, Plaintiff was "forced" to choose "between eating food that violated his religious beliefs, and not eating anything at all." *Id.* ¶ 60.

As such, Plaintiff brings suit against Defendants in their individual and official capacities pursuant to 42 U.S.C. § 1983, the First Amendment of the U.S. Constitution for violation of the right to the free exercise of religion, the Eighth Amendment of the U.S. Constitution for deprivation of a basic human need, and the RLUIPA for substantially burdening his religious exercise, and he seeks compensatory and punitive damages and

demands a jury trial on all triable issues. (Docs. 1, 49, 74 at 12.)[2] Defendants seek partial summary judgment on the Eighth Amendment and RLUIPA claims, but not on the First Amendment claim. (Doc. 78.)

## IV.   DISCUSSION
### A. Eighth Amendment Claim
#### 1.  Legal Standard

The Eighth Amendment prohibits cruel and unusual punishment by the government, which can give rise to legal claims on three grounds: "conditions of confinement, the excessive use of force, and the deliberate indifference to a prisoner's serious medical needs." *Thomas v. Bryant*, 614 F.3d 1288, 1303-04 (11th Cir. 2010) "Each of these claims requires a two-prong showing: an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities' and a subjective showing that the official had a 'sufficiently culpable state of mind.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[T]o make out a claim for an unconstitutional condition of confinement, 'extreme deprivations' are required," and "the relevant state of mind for purposes of liability is deliberate indifference." *Id.* at 1304.

#### 2.  Objective Seriousness of the Conditions of Confinement

"Conditions are objectively serious or extreme if they amount to a deprivation of the 'minimal civilized measure of life's necessities,' [] or 'the basic human needs,' including 'reasonably adequate food, clothing, shelter, and sanitation.'" *Quintanilla v. Bryson*, 730 F. App'x 738, 746 (11th Cir. 2018) (citations omitted). The Eleventh Circuit has "long recognized a well established Eighth Amendment right not to be confined . . . in conditions lacking basic sanitation." *Id.* (citing *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015)). Furthermore, "'a condition which might not ordinarily violate the Eighth Amendment may nonetheless do

---

[2] In his initial Complaint, Plaintiff also sought "a preliminary and permanent injunction for Defendants to ensure that religious meals are nutritionally adequate on a daily basis and all procedures are consistently carried out." (Doc. 1 at 5.) But because Plaintiff was transferred to Hays State Prison in September 2016 and is only suing two officials at Valdosta State Prison, the Eleventh Circuit has deemed his request for injunctive relief moot. (Doc. 41 at 11-12.)

so if it persists over an extended period of time.'" *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) (citation omitted) (explaining that court should consider both severity and duration).

Here, Plaintiff asserts that with the exception of a few weeks, he was regularly provided food and drink that were unsanitary, contained chemicals, insects, and dirt, were nutritionally inadequate, and often contaminated with non-vegan items in violation of his religious beliefs. (Doc. 83-2 ¶¶ 6, 20, 29.) Plaintiff contends that the food was so inadequate and unsanitary, that there was a time when he lost eleven pounds in two weeks, and he often felt physically ill, hungry, and unable to concentrate. *Id.*¶ 59, 63, 67. Plaintiff testified about his hunger from watered-down meals and that there were times when he ate the non-vegan or contaminated food because otherwise, he would have nothing to eat that day. (*See* Doc. 83-4 at 42, 62) (Robbins testifying that "I'm going through all these different symptoms, because I'm hungry. I ain't eating enough."); *id.* at 74 ("[I]f you was [sic] to add up all that food together, you will know this is generally just one meal. After I get done with eating this, it ain't gonna be too long I'll be hungry again."); *id.* at 118-120 ("If it came down to the fact that I wasn't going to eat that day….[T]hen most likely I probably ate that tray because I have to survive."); *id.* at 121 (Robbins testifying that the bread was often "inedible" and that he could not consume it because "[i]t was entirely too hard."). Defendants dispute Plaintiff's allegations about the quality of the food and the food's effects on his health, but their disputes do not warrant summary judgment on this issue.

At the summary judgment stage, the Court cannot "weigh[] the evidence and reach[] factual inferences contrary to [the plaintiff's] competent evidence," but must draw all "reasonable inferences in favor of the nonmoving party." *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). It would be inappropriate for the Court to credit the Defendants' statements over Plaintiff's. *Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x 910, 916 (11th Cir. 2019) (finding that the district court erred in relying on medical records and the nurse's sworn statement that there were no visible injuries to grant summary judgment to defendants); *see also Reid v. Sec'y, Fla. Dep't of Corr.*, 486 F. App'x 848, 852 (11th Cir. 2012) ("While it is true that [Plaintiff's] medical records do not support the version of the facts he presents in his affidavit, all this means is that there is conflict in the evidence, which we must resolve at the summary judgment

stage in [Plaintiff's] favor."). A Plaintiff need not offer more than his own plausible affidavit and testimony to create a dispute of fact at this stage. *Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x 910, 917 ("[T]he self-serving nature of [Plaintiff's] sworn statements do not preclude those statements from creating a genuine dispute of material fact, and there is no uncontroverted objective evidence rendering his account implausible.").

While the Eighth Amendment does not necessarily require that prison officials "indulge inmates' dietary preferences[,]" even those based on religion, it does require that prisoners receive "'[a] well-balanced meal, containing sufficient nutritional value to preserve health.'"[3] (Doc. 41 at 21) (quoting *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572 (11th Cir. 1985)). A reasonable factfinder taking Plaintiff's assertions as true could conclude that regardless of whether the meals provided to Plaintiff were vegan, they often did not constitute nutritionally and sanitarily adequate food. *Cf. Freeman v. Sample*, 814 F. App'x 455, 460 (11th Cir. 2020) (affirming this Court's grant of summary judgment to defendant because, *inter alia*, plaintiff "does not allege that the defendants failed to provide edible meals" but only that "he refused to eat some of the food provided because it was not prepared in accordance with his religious beliefs"); *see also Turner v. Warden, GDCP*, 650 F. App'x 695, 702 (11th Cir. 2016) (affirming summary judgment to defendants where plaintiff "was not regularly deprived of adequate nutrition and points to no evidence that his health was jeopardized due to [a] single deprivation"). While it is true that Plaintiff chose to forgo eating certain food or meals to adhere to his religion, Plaintiff also testified to and alleged the nutritionally deficient nature of the vegan meals and the unsanitary nature of the water and meals on a regular basis.[4] He has consistently alleged that the bread was often so hard that it was inedible, that the peanut butter was barely existent, that he could not drink the beverages because they were "filthy" and tasted like chemicals, and that the vegetables were so watered down and lacking in calories that he

---

[3] This Court does not assume that the Eighth Amendment establishes a right to vegan meals for religious reasons because such an assumption is not necessary in light of Plaintiff's numerous complaints and allegations regarding the inadequate nutritional and sanitary quality of the food overall.

[4] While the record does not establish that Defendant Robertson would be responsible for some of the problems with the meals, such as the rust on Plaintiff's cell door flap or the temperature of the food, a reasonable factfinder could conclude that Robertson was responsible for other problems such as the food's low nutritional value and edibility.

was often hungry, feeling unwell, and weak. *See, e.g.*, Doc. 83-4 at 57-58, 61-62, 73-74, 121, 126-28; Doc. 83-15 ¶¶ 6-9. Thus, a jury could conclude that the overall meal service violated the Eighth Amendment because the meals were not nutritionally adequate to preserve Plaintiff's health. Furthermore, the Eleventh Circuit has already concluded that Plaintiff's assertion that the meals were inadequate is bolstered by the allegations and evidence that Plaintiff's health had been so negatively impacted that the prison medical staff prescribed him extra meals. (*See* Doc. 41 at 17; Doc. 78-6 ¶ 10.) Thus, Plaintiff has alleged facts that, taken together, create a genuine issue of material fact as to whether he was subjected to an extreme deprivation in violation of the Eighth Amendment.

### 3. Deliberate Indifference

"Conditions that fall below minimal constitutional standards of decency do not alone amount to a violation of the Eighth Amendment" unless "the defendants were deliberately indifferent to the risks the conditions posed" to the plaintiff's health or safety. *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018). "Deliberate indifference is established by showing: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'" *Saunders v. Sheriff of Brevard Cty.*, 735 F. App'x 559, 572 (11th Cir. 2018) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Thus, "'[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'" *Id.* (quoting *Marsh v. Butler Cty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007)). Furthermore, the Eleventh Circuit has held that "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment[,]" but a plaintiff must show "that the conditions of his confinement created an unreasonable risk of harm to his health or safety." *Turner*, 650 F. App'x at 701 (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004)).

Plaintiff alleges that he repeatedly filed grievances and complaints and informed Robertson and Warden Allen of the issues with the meals. (Doc. 74 ¶ 21.) In February 2015, Plaintiff submitted a grievance complaining about the inadequate quality of the vegan meals, their impact on his religion, and that he was "suffering from constant headaches, hunger pains,

dizziness, fatigue, and lack of concentration" as a result of the vegan meals. *See* Doc. 83-9 at 10. Plaintiff testified that he wrote letters to Robertson "at least once a week, sometimes it might have been twice a week in order to get his attention," and that the mail lady confirmed she had given Plaintiff's letters to Robertson. (Doc. 83-4 at 151-52.) Plaintiff also testified that he personally spoke to Warden Allen about the meals, stating that he "basically begged the man numerous times, please do something about these trays[,]" and he even showed Allen his tray on one occasion, but Allen just "brushed [him] off." (Doc. 83-4 at 148-149; Doc. 83-2 ¶¶ 62-81.) While it is not clear what exactly Plaintiff told Robertson and Allen at VSP, Plaintiff has testified that the meals he was served caused him numerous symptoms "probably [his] entire time there," including stomach pain, lack of concentration, weak knees, headaches, back pain, and muscle atrophy, which resulted in him making multiple sick calls, as he was directed to do by the Warden and GDOC. (Doc. 83-4 at 159-160.) Furthermore, three letters that Robbins wrote to Robertson in February and March 2015 have been filed on the record, in which Robbins writes that the food "is barely existent" and that he is "hungry everyday," "weak from lack of sufficient food[]" and "physically deteriorating in weight." (Doc. 83-17 at 2; *see also* Docs. 83-16 and 83-18.)

Importantly, Robertson does not contend that he did not receive these letters, only that he does not recall receiving the letters. (Doc. 78-4 ¶¶ 25-27.) But Robertson also states that he has "no specific recollection" of responding to Robbins' grievance, although his records show that he investigated it and determined that nothing needed to be corrected. (Doc. 78-4 ¶¶ 26-27; Doc. 78-4 at 29-30.) Robertson now states in his declaration that he believed that the regular and vegan meals were sufficient to maintain inmate health, and he asserts that he was not aware "of any medical determination" that Plaintiff "faced a risk of harm to his health as a result of the meals." (Doc. 78-4 ¶¶ 28-29.) Similarly, Warden Allen states that he does not specifically recall Plaintiff speaking with him, but that Allen would have instructed any inmate who complained of illness to put in a sick call request and that Allen was never aware "of any medical determination" that Plaintiff "faced a risk of harm to his health as a result of the meals." (Doc. 78-3 ¶¶ 13, 15, 18.)

Notwithstanding Defendants' statements to the contrary, a reasonable factfinder viewing these facts in a light most favorable to Plaintiff could conclude that Defendants were aware of a serious risk to Plaintiff's health as a result of the meals as they were made aware numerous times of Plaintiff's complaints about the low caloric value of the food and its significant impact on his health. Indeed, Plaintiff testified that in April 2015 the meals improved for a few weeks: the prison starting using trays with bigger food compartments and the vegan trays were wrapped and placed on the bottom shelf of the cart, but the meals soon returned to the initial poor state. (Doc. 83-4 at 58:2-59:9, 101-103.) The Eleventh Circuit has already found that Plaintiff's allegations that the meals temporarily improved in response to his grievance "suggest[s] that Defendants knew about his complaints and considered them significant enough to warrant responsive action[]" and that although Defendants "had been placed on notice of the nutritional deficits, they subsequently acted with deliberate indifference to Plaintiff's nutritional needs when they once again began serving deficient meals." (Doc. 41 at 24) (citing *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (noting that the defendant "was obviously aware of the contents of [the inmate's] complaint because he responded to it")). Defendants have not cited, and the Court is unaware of, any case requiring that the defendants receive a "medical determination" about the serious risk of harm to a plaintiff's health. And this is not a case where the sole assertion is that Plaintiff refused to eat the food and thereby caused himself to be hungry or where the food was only occasionally nutritionally deficient. *Cf. Freeman*, 814 F. App'x at 460; *Turner, GDCP*, 650 F. App'x at 702. Plaintiff frequently complained to Robertson and Warden Allen about the food, including its nutritional deficiencies, after which the serving trays temporarily contained larger food compartments, and thereafter allegedly returned to their previous inadequate state. Plaintiff also alleged that the prison staff was known to retaliate against prisoners who filed lawsuits – this lawsuit having been filed in the summer of 2015. (Doc. 83-15 ¶ 71; Doc. 83-4 at 173-74.)

In sum, the record taken as a whole does not allow the Court to enter judgment as a matter of law in favor of Defendants because genuine issues of material fact exist on the subjective components of Plaintiff's Eighth Amendment claim.

### 4.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Further, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citation and internal quotation marks omitted).

Because there is no dispute that Defendants were acting within their discretionary authority here (Doc. 83 at 25 n.11), "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). "If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine 'whether the right was clearly established.'" *Id.* (citation omitted) (emphasis in original). For the reasons explained above, a reasonable juror could conclude that Plaintiff's Eighth Amendment rights had been violated based on Defendants' failure to provide him a nutritionally sufficient diet.

"[F]or a federal right to be clearly established, the applicable law 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730 (2002) (citation omitted). A plaintiff can show that the law is clearly established by showing: "'that a materially similar case has already been decided,'" that "'a broader, clearly established principle should control the novel facts' of a particular situation," or that his case "fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019)). "[G]overnment officials will be shielded by qualified immunity 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have

violated.'" *Freeman*, 814 F. App'x at 461 (citation omitted). The "'salient question' . . . is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional." *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (citation omitted). Here, Defendants had been fairly warned.

Defendants argue that qualified immunity applies because "it was not clearly established at the time that a prison official can be held liable for deliberate indifference to a risk of harm from an inmate's meals when the official was not personally aware that the meals were so inadequate as to present a danger to the health of the inmate" and where "the medical evidence shows that the inmate did not suffer any significant risk to, or decline in, his health as a result of the meals."[5] Doc. 78-2 at 21. But that is not the standard, and a reasonable jury could conclude that Plaintiff suffered significant risks to his health from the diet at VSP. Moreover, at the time Plaintiff was at VSP, it was clearly established that prison officials must provide prisoners with "basic necessities" like "food," specifically "[a] well-balanced meal, containing sufficient nutritional value to preserve health." *Hamm*, 774 F.2d at 1574-75 (quoting *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977)). Further, it was well-established that the length of the condition must also be considered because "a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978). Because Plaintiff's evidence shows that he repeatedly complained to Defendants about the inadequate nutritional quality of the food and that the food caused him to experience various physical symptoms,[6] the Court finds that either based on the aforementioned broader established legal principles or because it is obviously unconstitutional to fail to provide an inmate nutritionally adequate food for more than a year, qualified immunity is not appropriate. *See*, *e.g.*, *Brown v. Thompson*, 868 F. Supp. 326, 330 (S.D. Ga. 1994) ("Denial of food and medical attention are, *prima facie,* clearly established violations of the Eighth Amendment.")

Accordingly, summary judgment is **DENIED** to Defendants on the Eighth Amendment claim.

---

[5] Furthermore, qualified immunity is not appropriate merely because a plaintiff has not shown that he suffered physical injury; nominal damages is an available form of relief. *Brooks v. Powell*, 800 F.3d 1295, 1308 (11th Cir. 2015).

[6] This evidence is bolstered by the evidence showing rapid weight loss and a medical prescription of additional food.

### B. RLUIPA Claim for Damages

Plaintiff amended his Complaint to seek RLUIPA damages after the U.S. Supreme Court issued its opinion holding that "RFRA provides, as one avenue for relief, a right to seek damages against Government employees." *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020). RFRA provides that a person whose exercise of religion has been unlawfully burdened may "obtain appropriate relief against a government." *Tanzin*, 141 S. Ct. at 490 (quoting 42 U. S. C. §2000bb-1(c)). The Court explained that "[t]here is no doubt that damages claims have always been available under §1983 for clearly established violations of the First Amendment." *Id.* at 492. The Court further found that "appropriate relief" must encompass monetary damages because damages are "the only form of relief that can remedy some RFRA violations." *Id.*

Similarly, the RLUIPA provides that a person whose exercise of religion is unlawfully burdened may "assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 USCS §§ 2000cc-1, 2000cc-2. Because of their similar language and shared purpose "to provide very broad protection for religious liberty," the RFRA and RLUIPA are considered "sister" statutes. *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). Thus, Plaintiff argues that because RLUIPA contains "identical language" to RFRA, "Congress clearly intended that RFRA and RLUIPA may be enforced against individual officers by private damages actions." (Doc. 83 at 29-31) ("Congress expressly recognized that the proposed language [for RLUIPA] 'track[s] RFRA, creating a private cause of action for damages, injunction, and declaratory judgment.'") (quoting H.R. Rep. No. 106-219, at 29).

But Defendants disagree. Defendants assert that *Tanzin* did not discuss whether its holding applies to RLUIPA, and that unlike RFRA which was adopted under Section 5 of the Fourteenth Amendment, RLUIPA was adopted under the Spending and Commerce Clause supporting the Eleventh Circuit's prior holding in *Smith* that civil liability should not generally be imposed on individuals under the Spending and Commerce Clause who do not receive federal funding. (Doc. 78-2 at 24) (citing *Smith v. Allen*, 502 F.3d 1255, 1273-75 (11th Cir. 2007) (overruled and abrogated in part on other grounds). In *Smith*, the Eleventh Circuit Court of Appeals held: "Congress cannot use its Spending Power to subject a non-recipient of federal

funds, including a state official acting [in] his or her individual capacity, to private liability for monetary damages. . . . [W]e conclude that section 3 of RLUIPA—a provision that derives from Congress' Spending Power—cannot be construed as creating a private action against individual defendants for monetary damages."). 502 F.3d 1255, 1273-75. Thus, Defendants argue that "*Tanzin* did not abrogate *Smith*, which remains controlling authority in this Circuit." *Id.* at 25.

Neither the Eleventh Circuit nor the U.S. Supreme Court have addressed this specific issue since *Tanzin*, which remains unsettled. District courts in the Sixth Circuit have concluded that because of the nature of the Spending and Commerce Clauses, their prior determination that "RLUIPA does not authorize damages against state officials in their individual capacity was not expressly overruled by *Tanzin*" and that a Plaintiff "therefore is not entitled to damages against Defendants in their individual capacities for the alleged violations of RLUIPA." *Mease v. Washington*, No. 2:20-cv-176, 2021 U.S. Dist. LEXIS 91122, at *43-44 (W.D. Mich. May 13, 2021); *see also Chaaban v. City of Detroit*, No. 20-CV-12709, 2021 U.S. Dist. LEXIS 169329, 2021 WL 4060986, at *5 (E.D. Mich. Sept. 7, 2021) (same). While at least one court has declined to grant summary judgment on this issue finding that it is not clear that damages for RLUIPA claims are unavailable in light of *Tanzin*. *Gill v. Coyne*, No. 3:18-CV-00631-CHL, 2021 U.S. Dist. LEXIS 198152, at *52-53 (W.D. Ky. Oct. 13, 2021) (declining to grant summary judgment on RLUIPA claim because "Defendants have failed to establish that Plaintiff's claim for monetary damages under RLUIPA is precluded as a matter of law.").

Upon review, the Court is persuaded that Defendants' position is correct. The Supreme Court previously held that "'[a]ppropriate relief' is open-ended and ambiguous" and that "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver." *Sossamon v. Texas*, 563 U.S. 277, 286, 293 (2011). Indeed, unlike RFRA, RLUIPA specifically applies to states and local governments where the substantial burden "is imposed in a program or activity that receives Federal financial assistance" or "affects" foreign or interstate commerce. 42 U.S.C.S. § 2000cc-1(b); *see also Cutter v. Wilkinson*, 544 U.S. 709, 715-16 (2005) (discussing how RLUIPA was enacted under

the Spending and Commerce Clause after RFRA was invalidated as applied to the states because it exceeded Congress' remedial powers under the Fourteenth Amendment). *Sossamon* remains good law and, applied here, continues to support the holding in *Smith* that state actors cannot be sued in their individual capacities under RLUIPA because they do not receive federal funding.

Further, *Tanzin* did not expressly overrule cases like *Smith* or address RLUIPA whatsoever. And contrary to Plaintiff's argument otherwise (Doc. 83 at 31), RLUIPA does not "clearly express[]" Congress' intent to allow damages against individual state employees, nor is there any binding case law that allows the Court to reach such a conclusion. Rather, most courts have continued to hold that RLUIPA damages against individuals are not allowed following *Tanzin*. *See, e.g., Williams v. Redman*, No. 3:20-CV-196-JD-MGG, 2021 U.S. Dist. LEXIS 90203, at *6 (N.D. Ind. May 12, 2021) ("RLUIPA does not permit a suit against an individual for money damages because the individual does not receive federal funds."); *Tripathy v. Schneider*, No. 21-CV-6339 FPG, 2021 U.S. Dist. LEXIS 176716, at *3-4 (W.D.N.Y. Sep. 16, 2021) ("Plaintiff's reliance on *Tanzin* is misplaced. The distinction drawn by *Tanzin* is between claims against federal employees, against whom claims for money damages are permitted, and state employees, against whom such claims are not permitted."). And it appears undisputed that Plaintiff is pursuing RLUIPA damages against Defendants in their individual capacities and that Defendants do not receive federal funds in their individual capacities. *See* Doc. 78-2 at 1, 22; Doc. 83 at 30;[7] *Rodriguez v. Bryson*, 2019 U.S. Dist. LEXIS 152205, at *25-26 (M.D. Ga. July 9, 2019) (holding that *Smith* "bars Plaintiff from obtaining monetary damages under RLUIPA against officials sued in … their individual … capacit[y].").

As such, consistent with the existing binding precedent, the Court must conclude that damages against the Defendants in their individual capacities are not permitted by RLUIPA.

---

[7] Plaintiff's counsel did not dispute these facts at oral argument. Furthermore, Plaintiff does not argue in his response brief that he is pursuing claims against Defendants in their official capacities, and, per *Sossamon*, official capacity claims also appear barred under RLUIPA. 563 U.S. at 286, 293.

## <u>CONCLUSION</u>

Accordingly, Defendants' Motion for Partial Summary Judgment (Doc. 78) is **DENIED-IN-PART** and **GRANTED-IN-PART**. Summary judgment is granted to Defendants on the RLUIPA claim but is denied on the Eighth Amendment claim on which genuine issues of material fact remain. This case remains set for the Court's August 2022 trial term on Plaintiff's Eighth Amendment and First Amendment claims.

**SO ORDERED**, this <u>6th</u>  day of January 2022.

<u>/s/ W. Louis Sands</u>
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**